**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

Criminal Case No. 21-cr-0014-PAB-1

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

1.    JIMMY GARRISON,

    Defendant.

_____

**MOTION TO SEVER AND FOR SEPARATE TRIAL, AND REQUEST FOR
EVIDENTIARY HEARING**
_____

Defendant Jimmy Garrison, through court-appointed co-counsel Daniel J. Sears and James Castle, pursuant to F. R. Crim. P. Rule 14, respectfully request this Honorable Court to enter an order severing the trials of Defendant Garrison and Co-Defendant Justin White, and to grant a separate trial of Garrison.

As grounds for said motion, Defendant Garrison hereby states that the prospective presentation of significantly disparate evidence against each co-defendant and mutually-antagonistic defenses will deprive Defendant Garrison of a fair trial. Defendant Garrison seeks an evidentiary hearing during which he will present evidence in support of this motion.

**STATEMENT OF THE CASE**

On January 18, 2022, Defendant Garrison was charged in a superseding indictment, along with David Taylor, Jamarious Jones and Justin White, on five counts, including charges of violating the Hobbs Act, 18 U.S.C. §1951(a), and brandishing a firearm in violation of 18 U.S.C. §924(c)(1)(A)(ii). ECF Document 45. Defendants Jones and

Taylor have entered into plea dispositions with the United States. See ECF Documents 55 and 113. A joint trial of Co-defendants Garrison and White is scheduled to commence on January 9, 2023.

On June 21, 2021, Denver Police Detective Jared Purdy executed an application for a search warrant to obtain DNA evidence through buccal swabs from the mouth of Defendant Garrison. Exhibit A attached hereto. The application was supported by an affidavit dated June 21, 2021, which was twenty-one pages in length. It purportedly summarized most of the evidence gathered by investigators up until that date. Exhibit A, pp. 4 to 24 of 24.  A review of the individual allegations against Jimmy Garrison and Justin White demonstrate the substantial disparity in the evidence to be presented against each and, through the additional presentation of DNA evidence, the antagonism of the prospective defenses to be presented by the defendants.

In recounting the investigation, Affiant Purdy described the robbery of a Brinks armored truck at the Bank of Colorado, 5201 South Yosemite Street, Greenwood Village, Colorado, on October 30, 2019. ¶¶6-11, Exhibit A at 5 to 6 of 24. Reviewing a camera recording outside the bank, he described the actions of the three robbery suspects. ¶¶9-11, *Id.* at 6 of 24. Photos of the three suspects, their visible actions, and a description of their attire were included. ¶¶14-18, *Id.* at 7 to 8 of 24. The images of the three suspects fail to depict any identifying features that could lead to their respective identifications. Suspect #3 was described as carrying a "dark blue" bag identical to one left in the rear of the Brinks truck after the robbery. ¶¶16-18, *Id.* at 7 to 9 of 24. The surveillance camera captured images of a black Nissan Maxima circling the parking lot at the time of the robbery. ¶¶19-20, *Id.* at 9 of 24. No identifying features of the vehicle or the license plate

can be made out. The Nissan Pathfinder used by the robbers was located on November 21, 2019, ¶21, *Id.* at 10 of 24. Purdy, without providing supporting articulable facts, alleged that the Pathfinder "had been stolen from a Dallas-area auto auction lot (Mannheim)" in the days preceding the Colorado robbery. ¶21, *Id.* at 10 of 24. He also noted that a black Ford Focus stolen from the Mannheim lot had been used in a June 8, 2019, armored truck robbery in Houston, Texas. ¶21, *Id.* at 10 of 24. A Visa credit slip from a gas station was discovered in a Ford Raptor which was purportedly drawn on an account used by Jimmy Garrison.[1]  Further review of camera footage taken in the neighborhood where the Pathfinder was located, according to Purdy, showed the same black Nissan Maxima fleeing the scene of the robbery. ¶22, *Id.* at 10-11 of 24.[2]

Purdy included information about a Brinks armored truck robbery on October 24, 2019, in Houston, Texas, during which a driver was shot and killed.¶25, *Id.* at 11 of 24.  No articulable facts connecting Garrison to this robbery were offered. Purdy merely asserted, without supporting evidence, that investigators "eventually learned that the weapons and method of operation (including the use of follow vehicles) used in the Houston murder and robbery <u>were similar to</u> the method of operation and weapons used by the suspects who committed the robbery in Greenwood Village on October 30, 2019."  (Emphasis added). ¶25, *Id.* at 11 of 24.   He added that investigators, on November 21, 2019, learned that the

---

[1]  Purdy provided no evidence by which the reviewing magistrate could conclude that Garrison had any linkage to the Houston armored truck robbery, or the theft of the Pathfinder. Evidence to be presented at an evidentiary hearing will show that the credit slip had an incomplete card number, and could not be positively identified as the account of Jimmy Garrison.

[2] Neither the occupants of the Maxima or the Pathfinder could be identified. As Purdy noted, investigators obtained a search warrant for the Pathfinder on November 6, 2019, to "search for evidence <u>that could identify the suspects</u>".(Emphasis added). ¶23, *Id.* at 11 of 24.

Houston Police Department had arrested several persons in the October 24, 2019, murder and robbery case, that they had been followed to Lake Charles, Louisiana, where they were observed attempting to steal an ATM by using a log chain, which was similar to the packaging of a log chain found in the Nissan Pathfinder. ¶26, *Id.* at 11-12 of 24. Those arrested in the Lake Charles incident were Rodney Hill, Harold Oliver, Aje Carter, Quaylon Brown Javarion Davis, and Reginald Simmons. ¶27, *Id.* at 12 of 24.  No evidence was provided showing Garrison was involved in these events.

Text messages extracted from a cellphone seized from Quaylon Brown disclosed that Brown had texted to a phone listed to David Taylor on October 27 and 30, 2019. ¶29, *Id.* at 12 of 24. Garrison was not a participant in, or a subject of, these texts. Other text communications showed no connection to Garrison. ¶¶30-35, *Id.* at 12-13 of 24.  Observing an Instagram posting on Brown's phone, investigators concluded that Brown had been at the Crowne Plaza at 1450 Glenarm Street, Denver. ¶38, *Id.* at 14 of 24.  The face of the person in an Instagram posting could not be seen, but Purdy concluded that the shoes worn by the person "were consistent with" the shoes worn by Suspect #3 during the Colorado robbery.[3] ¶38, *Id.* at 14 of 24. A photo image of the shoeprint left in the snow was included in the affidavit and, though it is described as "Suspect #3 shoe", no facts are included which support this assertion.

Images extracted from Quaylon Brown's iPhone showed a number of weapons which investigators concluded "were consistent with the weapons used during the robbery on October 30, 2019, in Greenwood Village, Colorado". ¶39*, Id.* at 16 of 24.   No serial

---

[3] Evidence will show that, though investigators were provided photos of some shoeprints left in the snow behind the Brinks truck, no comparisons were ever made between those print images and any shoes belonging to the suspects in the Colorado robbery.

4

numbers or distinctive markings can be gleaned from the photos which would tie any of the firearms to Garrison or the Colorado robbery.

A "group chat" between Quaylon Brown and several other individuals included an ABC News report of the Greenwood Village robbery and some comments by Brown, from which investigators deduced that Brown participated in the Colorado robbery. ¶40, *Id.* at 16 of 24. Again, no facts are provided which link Garrison to the Colorado robbery or any robbery.

Investigation by Houston authorities into an armored truck robbery in Beaumont, Texas, showed movements of the suspects' vehicles, which Purdy proffered "were consistent with the methods used by suspects in recent armored truck robberies that occurred in Texas and Colorado in 2019." Suspects involved in the Texas robberies were David Taylor, Jamarious Jones, Prentis Delaney, and Coray Q Brown, not Jimmy Garrison. ¶42, *Id.* at 17 of 24.

A search warrant was obtained for call detail records from David Taylor's phone. ¶44, *Id.* at 17 of 24. Examination of the records showed that Taylor frequently called a phone listed to Justin White, and that pawn transactions by White disclosed his address as 9888 E. Vassar Drive, Denver, Colorado. ¶45, *Id.* at 18 of 24. The data revealed that White is the registered owner of a black 2014 Nissan Maxima bearing Texas license plate KMY7221. ¶50, *Id.* at 18 of 24.  Further review showed the Maxima in the Houston and Corpus Christi, Texas areas throughout 2019 until early September, in the Aurora, Colorado, area on or after September 16, 2019, and in the vicinity of the White's apartment complex on March 3, 2020.  ¶¶50-51, *Id.* at 18 of 24.  No evidence is presented that Garrison was observed or detected on any of these dates, in any of these areas.

Purdy incorporated information regarding a Loomis truck robbery in Houston on September 5, 2019. ¶51, *Id.* at 18 to 19 of 24. He offered no facts tying Garrison to this robbery, but proffered that "[t]he method of operation and physical description of the suspects in the September 5, 2019, incident matches the robbery at 5201 S. Yosemite St. on October 30, 2019." (Emphasis added). ¶52, *Id.* at 19 of 24.

On March 6, 2020, Commerce City police officer Michael Kim drove to 9888 E. Vassar Drive to locate the Nissan Maxima registered to Justin White. ¶53, *Id.* at 19 of 24. Kim recognized it "as apparently the same Maxima" seen in the surveillance photos on October 30, 2019. (Emphasis added). *Id.* Investigators opined that it is "the same vehicle seen picking up the robbers" in the Colorado robbery. ¶54, *Id.* at 20 of 24.[4] On March 23, Kim obtained a warrant to obtain historical location data from White's phone. ¶56, *Id.* at 20 of 24. Three days later, investigators located White's Maxima inside a garage at his Vassar Drive address. ¶57, *Id.* at 20 of 24. Kim requested officers with the Aurora Police Department to locate the Maxima to impound it "for a search pursuant to a warrant". ¶59, *Id.* at 21 of 24.[5] Before impounding the vehicle, officers observed Justin White and Jimmy Garrison exit a store and walk towards the Maxima. *Id.* White was questioned, the two were released, and the Maxima was impounded and transported to the Denver Police Vehicle Impound Facility. ¶60, *Id.* at 21 of 24. Purdy suggested, without any supporting facts, that investigators "immediately recognized that Jimmy Garrison matched the physical description of Suspect #3 in the Brinks robbery." (Emphasis added). ¶61, *Id.* at 21 of 24.[6]

---

[4] Again, neither the license plate nor any distinctive features of the Nissan can be gleaned from the surveillance photos or video.
[5] A warrant to search the vehicle had not been obtained.
[6] The physical description of Suspect #3 provided in the affidavit was that "he was wearing a dark colored Coca-Cola sweatshirt, had some type of material covering most of their nose

He then asserted, again without supporting evidence, that Houston investigators advised that "Jimmy Garrison's name <u>was related to</u> the investigation of an armored car robbery that occurred on June 8, 2019." (Emphasis added). ¶62, *Id.* at 21 of 24.  During the June 8, 2019, Houston robbery, the driver was shot in the arm, the suspects fled in a stolen vehicle which led investigators to another vehicle stolen from the same auto action lot from which the Nissan Pathfinder used in the Colorado robbery had been stolen. ¶62, *Id.,* at 22 of 24.  After obtaining and executing a warrant to search the Nissan Maxima, none of the items seized were related to Jimmy Garrison, and no evidence linked Garrison to the June 8 robbery or any other crime. ¶64, *Id.* at 22 of 24.

After obtaining and executing the warrant to obtain buccal swabs from Garrison's mouth, the Denver Crime lab reported Garrison as a major contributor of DNA on the blue bag recovered from the Brinks truck. ¶¶65 & 66, *Id.* at 22 of 24. Denver Detective Monahan obtained a search warrant for the call detail records from Garrison's iPhone from June 1, 2019, to April 27, 2020. ¶¶68 and 69, *Id.* at 23 of 24. The records showed Garrison's phone in the Houston area on September 8, 2019, and in the vicinity of Broken Arrow, OK, on September 9, 2019. ¶70, *Id.* at 23 of 24.[7] They further showed the phone in the vicinity of Denver International airport on October 7, 2019, moving to the Houston area, then returning to the Denver area on October 12, 2019, and remaining in the area. ¶71, *Id.* at 23 of 24. Other calls were made on October 31, 2019, the day after the Colorado robbery, but no

---

and mouth, dark colored pants, gloves, some type of camouflage shorts under their pants, dark colored shoes, and was carrying a handgun and dark blue bag." ¶16, *Id.* at 7-8 of 24. Purdy provided no detailed physical description of any of the robbers in the Loomis robbery, and no detailed facts which supported his conclusion that Garrison "matched" the description of Suspect #3 in the Colorado robbery.

[7]  This was more than a month before the Colorado robbery, and fails to provide any evidence of Garrison's involvement in the Colorado robbery.

connection is shown of these movements being related to the Colorado robbery or any other robbery. Garrison was indicted on February 2, 2021. ¶74, *Id.* at 23 of 24.

The above recitation, Garrison contends, shows the evidence which the government is likely to proffer against Garrison and White separately, but the disparity of the evidence against each individually.  Garrison must have the opportunity in a separate trial to concentrate in establishing the lack or insufficiency of the government's evidence to prove Garrison's guilt beyond a reasonable doubt, but also the separate evidence against White and the involvement of his Nissan Maxima in the Colorado robbery. Because of the close personal relationship from early childhood between Garrison and White and their being observed together during the investigation, Garrison's defense will present evidence through expert witnesses that there was transference of DNA between White and Garrison that may have been detected at the scene of the crime.  The presentation of such evidence will assuredly result in mutually-antagonistic defenses which will deprive Garrison of the right to the jury's individual consideration of the evidence against him which he would receive at a separate trial.

**ARGUMENT I**

**THE DISPARATE EVIDENCE TO BE PRESENTED AGAINST GARRISON AND WHITE IN A JOINT TRIAL WILL DEPRIVE GARRISON OF A FAIR TRIAL.**

Rule 8 of the Federal Rules of Criminal Procedure provides that multiple defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses". Garrison does not contest the joinder of the defendants in the indictment. Fed. R. Crim. P. 8(b).  Rule 14, however, states, in pertinent part, that "if it appears that a

defendant . . . is prejudiced . . . by such joinder for trial together, the court may . . . grant a severance of defendants or provide whatever relief justice requires". Fed. R. Crim. P. 14(a).

> "Prejudice occurs when there is a serious risk that a joint trial will compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Hines*, *13 2010 U.S. Dist. LEXIS 146728 (D. Colo. 2010) (*citing United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir. 2005) (*internal quotation marks omitted*)).

Ordinarily speaking, the mere assertions that the evidence against the joined defendants may be disproportionate, and/or that severance might improve a defendant's chances of acquittal are insufficient to warrant a severance and separate trials. Where, however, a defendant can demonstrate the possibility of real prejudice, a separate trial must be granted. *See United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir. 1984) (*citing Schaffer v. United States*, 362 U.S. 511 (1960). *See also United States v. Caldwell*, 560 F.3d 1214, 1221 (10th Cir. 2009) (Rule 14's prejudice standard requires showing of actual prejudice . . .").

As evident from a review of the evidence to be prospectively presented against Garrison and White in a joint trial, the evidence to be presented against Garrison is quantitatively disparate, distinctive and substantially less than that to be offered against White. Because the government's evidence will likely show the involvement of White's Nissan Maxima in the robbery, and his contacts with David Taylor and others, evidence which fails to indicate Garrison's linkage to the Brinks robbery, and data failing to show Garrison being in the vicinity of the robbery, the jury must have the opportunity to weigh this evidence individually in a separate trial.

The first reported contact that investigators had with Garrison was on March 26,

2020, when he was seen exiting a store with Justin White. Exhibit A, ¶59 at 21 of 24.[8] The next mention of Garrison's name was in connection with a gas credit slip that was reportedly found in a Ford Raptor pickup truck which was on the same auto lot in Dallas from where a black Ford Focus had been stolen. Though investigators believed the Ford Focus to have been used in a June 8, 2019, robbery, there was no evidence linking Garrison to it. Exhibit A, ¶21 at 10 of 24. Evidence to be proffered at an evidentiary hearing will show that the credit slip did not bear Jimmy Garrison's name, it was found in a vehicle not connected to the June 8 robbery, the account number was incomplete, and investigators failed to provide any evidence linking Garrison to the June 8 Houston robbery, the auto theft, or the Colorado robbery. Similarly, though Purdy offered information about an October 24, 2019, Houston Brinks robbery, and suggested that investigators believed the method of operation and weapons used were "similar to" those used in the Colorado robbery, he failed to provide any supporting facts detailing those similarities. In fact, he disclosed that the robbers arrested in the Houston robbery were Rodney Hill, Harold Oliver, Aje Carter, Quaylon Brown, Javarion Davis and Reginald Simmons, not Jimmy Garrison. ¶27, *Id.* at 12 of 24. Though Quaylon Brown's cellphone had been seized, no evidence recovered tied Brown or the others to Garrison.

As with the October 24, 2019, Houston Brinks robbery, Purdy recited events from a robbery in Beaumont, Texas, a Loomis robbery in Houston, and call detail records from

---

[8] Evidence to be presented at an evidentiary hearing will show that Garrison and White were childhood acquaintances, attended school together in Houston, Texas, and had continuing friendly relations and contacts throughout the course of their lives. Though this evidence may be used by the government to show their knowledge and familiarity with each other, this association provides no probative evidence of Garrison's participation in the alleged Colorado robbery. Such evidence offered in a joint trial is likely to confuse the issues and the jury in reaching a verdict based on the individualized evidence.

10

David Taylor's phone. Persons other than Garrison were linked to those robberies, and call records from Taylor's phone failed to provide any evidence relating to Garrison. ¶¶42-51, *Id.* at 17 to 19 of 24. While Garrison was seen in the company of Justin White on March 26, 2020, almost five months after the Colorado robbery, no improper activity by Garrison was observed or cited. ¶59, *Id.* at 21 of 24.

Prior to applying for, and obtaining the warrant to obtain, the buccal swabs from Garrison's mouth, the events recounted above reveal the paucity of the evidence gathered by the government to establish Garrison's participation in the Colorado robbery, or any theft or robbery. Purdy's inclusion of the illegal activities of others, or the similarity of activities to the Colorado robbery offered the reviewing magistrate little or no probative evidence, to support the hypotheses that Garrison had participated in any of these cited criminal events.

The evidence against White is digested, in part, in an application for a search warrant for the 2014 Nissan Maxima registered to White. The affidavit, executed by Commerce Police Officer Michael Kim, described the Colorado Brinks robbery. Exhibit B, ¶¶4-14 at 2 to 5 of 18. Surveillance video showed a black 2012 to 2014 Nissan Maxima in the vicinity of the robbery, and following the robbery vehicle from the scene. Photos of the Maxima were included. ¶¶15-16, *Id.* at 5 of 18.

When Quaylon Brown was arrested by the Lake Charles Police Department in connection with a Houston murder and robbery case, his cellphone was seized. ¶¶22-24, *Id.* at 8 of 18. Communications between Brown and David Taylor were obtained, which investigators contend, related to Brown's travel to the Crowne Plaza hotel in Denver, including comments linking him to the Colorado robbery. ¶¶25-38, *Id.* at 8 to 12 of 18. Garrison was not shown to be present at the Crowne Plaza hotel.

11

On January 13, 2019, David Taylor was arrested by Houston police in connection with a planned armored car robbery in Beaumont, Texas. ¶¶39-40, *Id.* at 12 to 13 of 18. A search warrant for, and subsequent data extraction from, Taylor's phone showed his travel from Houston to Denver around October 27, 2019, his being in proximity to the Colorado robbery on October 30, 2019, and frequent contacts with Justiin White. ¶¶42-43, *Id.* at 13 to 14 of 18. Database searches relating to Justin White disclosed his ownership of a black 2014 Nissan Maxima bearing Texas License KMY7221, and his address as 9888 E. Vassar Drive, Denver, Colorado. Data also reflected the Maxima in various locations in Texas and Colorado throughout 2019, and at an apartment complex at the Vassar Drive address. ¶44, *Id.* at 13 to 14 of 18. Investigators received information about a Loomis armored truck robbery on September 5, 2019, in Houston, Texas. License plate readers ("LPR's") detected White's Maxima in the Houston area the day prior to, and the day after, the Loomis robbery. ¶46, *Id.* at 14 to 15 of 18. The government's evidence, while purportedly showing these contacts between Justin White and David Taylor, shows no similar contacts between Garrison and Taylor.

On March 6, 2020, Officer Kim traveled to the Vassar Drive address and observed the Maxima parked there. He believed it to be the same vehicle seen trailing the Brinks truck prior to the Colorado robbery, circling in the parking lot during the robbery, and leaving the area with the Nissan Pathfinder after the robbery. ¶47, *Id.* at 15 of 18. At trial, the government likely will proffer evidence showing White's Maxima in proximity to the Colorado robbery, the Maxima's being detected in Houston both the day before and after the September 5, 2019, Loomis armored car robbery, and White's frequent phone contacts with Co-Defendant David Taylor. This evidence against White showing, among other things, his

12

frequent phone contacts with David Taylor who is linked to similar robberies in Texas, will introduce evidence against White that would not be admissible against Garrison in a separate trial.

## ARGUMENT II

### THE PROFFER OF EVIDENCE OF POSSIBLE TRANSFERENCE OF DNA BY WHITE GUARANTEES THE PRESENTATION OF MUTUALLY- ANTAGONISTIC DEFENSES BETWEEN THE CO-DEFENDANTS IN A JOINT TRIAL.

Pretrial discovery in the present case reveals that the prosecution will present evidence against Garrison and White that will purport to show each defendant's presence at the scene of the Colorado Brinks robbery, and contact with items of evidence found at the scene of the robbery. Though prosecutors will argue that swabs of DNA obtained from Garrison's mouth show matches to DNA specimens acquired from a blue bag and headrests from the Nissan Pathfinder used during the robbery, Defendant Garrison will present evidence which demonstrates, because of Garrison's associational contacts with White, the possibility of transfer of Garrison's DNA by White to these items of evidence.

Experts in the scientific community recognize the possibility of DNA transfer in the collecting and analysis of evidence in criminal cases. DNA-bearing cellular material can come to be present on an item by either direct or indirect transfer. Direct transfer occurs when a person has touched or has been near an item, whereas indirect transfer of DNA can result when a person's DNA is found on an item, but such person has not had any contact with that item. Such transfer can result from a handshake, speaking, coughing, sneezing or by coming into contact with a person who subsequently touches, or is in proximity to, the item.

"DNA-bearing cellular material can come to be present on a surface by either

direct or indirect transfer. Direct transfer includes contact, but also includes activities within the vicinity of an item that may result in the transfer of DNA directly from an individual without any contact, such as speaking, coughing, and sneezing. Indirect transfer of DNA is when DNA from an individual comes to be on an item via an intermediary surface. It is important to consider indirect transfer in the evaluation of trace DNA in casework. The term 'trace DNA' in this review refers solely to DNA that cannot be attributed to an identifiable body fluid. This review presents and considers data from trace DNA experiments to establish whether the quantity of DNA recovered from a crime stain and/or the quality of a DNA profile obtained can be used to infer the likely mechanism of transfer. The data show that varied results are obtained from apparently similar trace DNA samples, presumably due to the many factors that affect the detention of trace DNA. The nature and effect of these varying factors and the application of the data to casework is considered generally and with specific reference to DNA transfer to skin, DNA beneath fingernails, 'wearer DNA', and various contamination considerations." DNA transfer: review and implications for casework, Forensic Science International Genetics 2013 by Georgina Meakin and Allan Jamieson. Exhibit C attached hereto.

Jurors are heavily influenced by DNA evidence, and consider it highly persuasive.in reaching determinations of guilt or innocence in criminal cases. Transference, therefore, can be critical in establishing one's innocence

Investigators observed White and Garrison in each other's company on March 26, 2020. Independent evidence will show that they were childhood friends, schoolmates, and often in each other's company, which offered opportunities for DNA transference. It will be incumbent upon Garrison's defense team to present evidence regarding the possibility of transfer of DNA between the two when they were together. The transfer of Garrison's DNA to White, and his possible subsequent transfer of the DNA to an item of evidence collected at the scene of the robbery, will present mutually-antagonistic defenses to the jury. Moreover, considering the separate and disparate evidence against the two to be offered by the government, it is probable that Garrison will not receive the independent and individualized jury consideration of his case guaranteed by the Sixth Amendment.

If co-defendants in a joint trial present mutually antagonistic or irreconcilable

defenses, and a defendant will thereby be prejudiced, severance of the trials must be ordered. *United States v. Tootick*, 952 F.2d 1078, 1080 (9th Cir. 1991); *United States v. Rucker*, 915 F.2d 1511, 1512-13 (11th Cir. 1990); *United States v. Romanello*, 726 F.2d 173, 177-78 (5th Cir. 1984).

> "Mutually exclusive defenses are said to exist when acquittal of one co-defendant would necessarily call for the conviction of the other." *Tootick*, *supra* at 1081 (*citing United States v. Adler*, 879 F.2d 491, 497 (9th Cir. 1988)). *See United States v. Yousef*, 327 F.3d 56, 151 (2d Cir.2003) (*quoting United States v. Cardascia*, (951 F.2d 474, 484 (2d Cir. 1991).

Mutual exclusivity may also exist when one defendant accuses a co-defendant of committing the crime, but the co-defendant professes innocence. *Romanello*, *supra* at 177.

The more typical example of the presentation of antagonistic defenses in a trial is where "each of the two co-defendants claims innocence, seeking to prove instead that the other committed the crime". *Tootick, supra* at 1081 (*citing United States v. Holcomb*, 797 F.2d 1320, 1324 (5th Cir. 1986)). The conflict between the co-defendants must be such that "the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994) (*quoting United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985)).

Severance is mandated when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U. S. 534, 539 (1993). Where individual defendants in a joint trial present defenses that are antagonistic to each other, a substantial possibility exists that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty. *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. 1981) (*citing United States v. Eastwood,* 489 F.2d 818, 822 n.5 (5th Cir. 1973)

(*quoting United States v. Robinson,* 432 F.2d 1348, 1351 (D.C. Cir 1970).

The Tenth Circuit has outlined a three step process in which a reviewing court must engage in determining whether severance should be granted: First, it must determine whether the defenses presented "are so antagonistic that they are mutually exclusive". Second, because "[m]utually antagonistic defenses are not prejudicial *per se*, a defendant must further show 'a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence'". Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration. *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir. 2007) (citations omitted).

Where evidence is introduced against one defendant in a joint trial, which would be inadmissible against a co-defendant in a separately-held trial, there is a threat that it will "rub off" on the co-defendant depriving him of a fair trial. *United States v. Mardian*, 546 F.2d 973, 977 (D.C. Cir. 1976) (*citations omitted*) (trial court erred in denying motion for severance).. Such a result violates a cardinal rule in our criminal justice system that "guilt with us remains individual and personal*". Kotteakos v. United States*, 328 U.S. 750, 772 (1946). The danger of prejudicial spillover is present "when the evidence against one or more defendants is 'far more damaging' than the evidence against the moving party." *United States v. Mardian, supra* at 977 (*citing United States v. Bolden*, 514 F.2d 1301, 1310 (D.C. Cir. 1975) (separate trial ordered where evidence disparate).

WHEREFORE, Defendant Jimmy Garrison respectfully requests this Honorable Court to sever his case from Co-defendant White's, and to grant him a separate trial.

Respectfully submitted,

s/ Daniel J. Sears
DANIEL J. SEARS, P. C.
999 18th Street, Suite 3000
Denver, CO 80202
Phone: (303) 357 4639
FAX: (303) 297 2536
Email: djsearspc@aol.com

s/ James Castle
CASTLE & CASTLE, P. C.
1544 Race Street
Denver, CO 80206
Phone: (303) 675-0500
Email: jcastlelaw@gmail.com

Co-counsel for Defendant Garrison

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2022, I electronically served each of the parties to this action at their respective Email addresses notice of filing Motion to Sever and for Separate Trial by filing such pleading with the Clerk via the CM/ECF system which electronically sends notification of such filing to each person recorded as a party in such system:

s/ Daniel J. Sears
DANIEL J. SEARS, P. C.
Suite 3000, 999 18th Street
Denver, CO 80202
(303) 357 4639
FAX: (303) 297 2536
Email: djsearspc@aol.com